UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20183-BB

UNITED STATES OF AMERICA

v.

JOHN ADRIAN BUCK II,

      **Defendant.**

_____/

### STIPULATED FACTUAL PROFFER IN SUPPORT OF PLEA

If this matter were to proceed to trial, the Government would prove the following facts beyond a reasonable doubt. The Parties agree that these facts, which do not include all facts known to the Government and the Defendant, **JOHN ADRIAN BUCK II**, are sufficient to prove the guilt of the Defendant of the above-referenced Information:

Co-conspirator testimony and corroborating evidence would show that, during the time period of the Information, the Defendant was an employee of a Cayman Islands-based corporation that bought, sold, imported and exported gold. In his role as an employee of that corporation, the Defendant obtained gold in Curacao and imported that gold into the United States to sell to NTR Metals, a refinery which purchased the gold and did business under the name Elemetal LLC (hereinafter "NTR"). The imports to the United States and the sales of gold going from Curacao to NTR began in or about March 2015 and continued until approximately September 2016. These transactions, and in turn the wiring of money from NTR to the Cayman Islands corporation to pay for gold purchased by NTR, were accomplished with the assistance of other co-conspirators, including salespersons from NTR.

1

As Curacao had no mines, it was understood by the co-conspirators, including the Defendant, that the gold was likely brought to Curacao from Venezuela. Indeed, for this reason – the likelihood that gold was illegally mined and smuggled out of Venezuela and sent to Curacao – NTR would not accept gold that was listed as originating in Curacao. NTR had an anti-money laundering ("AML") policy that specifically prohibited the purchase of gold from Curacao. The co-conspirators, who included NTR salespersons that received a commission for the gold accepted by NTR, set about a plan to evade that policy, hiding the fact that the gold likely originated in Venezuela before it was purchased in Curacao. The plan was for the co-conspirators to route the gold from Curacao to Miami International Airport ("MIA"), ship the same gold to the Cayman Islands, and then from the Cayman Islands ship the gold back to MIA. However, as the gold entered the U.S. from the Cayman Islands, it was falsely reported to U.S. Customs as originating in the Cayman Islands rather than in Curacao or Venezuela.

Between March 2015 and September 2016, NTR imported thousands of kilograms of gold worth more than $141 million into the United States from the Defendant's company in the Cayman Islands. In each instance, the same gold was reported to U.S. Customs as having originated in Curaçao, and a few days later reported to U.S. Customs as having originated in the Cayman Islands. The Defendant conspired together with NTR salespersons and others in deceiving U.S. Customs when the gold arrived back in Miami from the Caymans.

The Defendant was aware that an important purpose of the route with the gold traveling from Miami to the Caymans and back to Miami was to hide the true origin of the gold, with U.S. Customs paperwork indicating the gold's provenance as being the Cayman Islands, thereby allowing NTR to accept the purchase and overriding NTR's AML policy prohibiting the purchase

of gold from Curacao. The Defendant was also aware that, in importing this gold and delivering it to NTR, it caused a wire payment to be made from NTR to a company in the Cayman Islands.

Furthermore, the Defendant was aware that the gold coming from Curacao was likely, illegally mined in Venezuela. If this case were to proceed to trial, the government would prove that that the laws of Curacao prohibit the importation of smuggled gold or illegally mined gold from Venezuela.

Each time after the gold arrived at NTR, money was in fact wired from a bank account in the U.S. to a bank account in the Cayman Islands pertaining to the Defendant's company. The value of the money wired was significantly over $10,000.

As an employee of the Cayman Islands company, the Defendant was paid a salary and these transactions made up at least 80 percent of his work at the company, such that the Defendant personally earned approximately $144,000 in U.S. Currency from the unlawful transactions.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Date: 8·9·22

By: _____
WALTER M. NORKIN
ASSISTANT UNITED STATES ATTORNEY

Date: 8/9/22

By: _____
ROBERT FRANKLIN, ESQ.
VALENTIN RODRIGUEZ, ESQ.
ATTORNEYS FOR DEFENDANT

Date: 8/9/22

By: _____
JOHN ADRIAN BUCK II
DEFENDANT

3